1  Heather Kliebenstein (*pro hac* forthcoming)
   William Schultz (*pro hac* forthcoming)
2  MERCHANT & GOULD P.C.
   150 South Fifth Street, Suite 2200
3  Minneapolis, Minnesota 55402
   hkliebenstein@merchantgould.com
4  wschultz@merchantgould.com
   Telephone:    612.332.5300
5  Facsimile:    612.332.9081

6  James Beard (SBN 267242)
   MERCHANT & GOULD P.C.
7  1801 California Street, Suite 3300
   Denver, Colorado 80238
8  jbeard@merchantgould.com
   Telephone:    303.357.1670
9  Facsimile:    612.332.9081

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12

13  PROPOINT SOLUTIONS, LLC,              )   Case No.:   3:20-cv-2181
                                          )
14              Plaintiff,                )
                                          )
15       vs.                              )   **COMPLAINT**
                                          )
16  REGIS CORPORATION; CHAD KAPADIA,      )
17  an individual; and JOHN DOES 1-10,    )
                                          )
18              Defendants.               )
                                          )
19  _____  )

20

21                          **COMPLAINT**

22       Plaintiff ProPoint Solutions, LLC, for its complaint against Defendants Regis Corporation,

23  LLC, Chad Kapadia, and John Does 1-10, states and alleges as follows:

                              **PARTIES**

24       1.      Plaintiff ProPoint Solutions, LLC ("ProPoint") is a Delaware Corporation with a

25  principal place of business at 314 N. 1st Ave, Ste. 300, Minneapolis, MN 55401.  Founded in 1999,

26  ProPoint developed and offers a complete business software solution for salons and spas.  Today,

27

28

ProPoint's salon management software is deployed at over 9,000 locations worldwide to deliver vital customer, scheduling, inventory and financial data to enable precise decision making.

2.      Defendant Regis Corporation ("Regis") is a Minnesota Company, which on information and belief has its principal place of business at 7201 Metro Blvd., Minneapolis, Minnesota 55439.

3.      Defendant Chat Kapadia is the Chief Technology Officer of Regis.  ProPoint is informed and believes, and thereon alleges, that Mr. Kapadia is an individual residing in this judicial district, and working in Fremont, California.  Further, on information and belief and as set forth in detail below, Mr. Kapadia engaged in the acts alleged herein while within this district.

## JURISDICTION AND VENUE

4.      This is an action for misappropriation of trade secrets under the Federal Defend Trade Secret Act, 18 U.S.C. § 1836 *et seq.* and the Minnesota Uniform Trade Secret Act, Minn. Stat. § 325C.01; the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and Intentional Interference With Contract under Minnesota state law.

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 based on 18 U.S.C. § 1836, and 18 U.S.C. § 1030.

6.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1836(b), based on ProPoint's claim of trade secret misappropriation under the Defend Trade Secrets Act related to ProPoint's proprietary software that is used in, and intended for use in, interstate commerce.  *See* 18 U.S.C. § 1836(b)(1).  ProPoint sells its proprietary software to customers across the United States, including in California.

7.      Additionally, Defendants' concerted efforts to and access of ProPoint's computer systems without authorization, or exceeding authorization, resulted in a loss to ProPoint totaling more than $5,000 over the past one-year period of time.  As set forth in detail herein, this loss includes at least the cost of engaging computer forensic experts to investigate the origin, scope, and nature of Defendants' bad acts, lost contracts, as well as significant time and effort spent by ProPoint employees, including its executive and technical teams in order to investigate and remedy the harm

caused by Defendants, respond to and defend against the acts of Defendants, and assess the damage caused by Defendants' incursion.  This time should have been, but could not be, spent conducting ProPoint's day-to-day operations.  Consequently, this Court has subject matter jurisdiction over ProPoint's claims arising under the Computer Fraud and Abuse Act (18 U.S.C. § 1030) pursuant to 28 U.S.C. § 1338.

8.      This Court additionally has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as there is diversity between parties and the amount in controversy exceeds $75,000.  *See* Paragraphs 1-3.

9.      The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

10.     This Court has personal jurisdiction over Defendants under Fed. R. Civ. P. 4(k)(1)(A) and California's long-arm statute, Cal. Civ. Proc. Code § 410.10, as Defendants have, on information and belief and as pled in detail herein, intentionally directed tortious conduct into and engaged in the actions alleged herein this district in the state of California, thereby purposefully availing themselves of the privilege of conducting business and activities within the state and invoking the benefits and protections of California's laws.

11.     In addition to the tortious act alleged herein, Defendant Regis maintains a website at www.regiscorp.com, which prominently includes information regarding (1) its California Privacy Policy, and (2) its California Collections Notice.  *See* www.regiscorp.com.  On information and belief, Defendant Regis owns or franchises numerous locations within this judicial district, including at least under the SuperCuts brand, and is therefore subject to the jurisdiction of this Court pursuant to at least Cal. Civ. Proc. Code § 410.10.

12.     On information and belief, Defendant Kapadia resides and works within this judicial district, in Fremont and Union City, respectively, and is therefore subject to the jurisdiction of this Court pursuant to at least Fed. R. Civ. P. 4(k)(1)(A), and, based on the tortious acts described herein, is further subject to the jurisdiction of this Court pursuant to at least Cal. Civ. Proc. Code § 410.10.

13.     Finally, on information and belief based on the currently available information regarding the acts and conduct of Defendants John Doe 1-10, each such defendant purposefully

directed tortious conduct within the state of California, including at least the coordination, direction, and acts alleged herein, and are therefore subject to the jurisdiction of this Court pursuant at least under Cal. Civ. Proc. Code § 410.10, or otherwise resides within this judicial district.

## **GENERAL ALLEGATIONS**

*ProPoint's Proprietary Software*

14.     ProPoint offers a complete software solution for the management of salons and spas.

15.     ProPoint's industry-leading salon management software is deployed at over 9,000 locations worldwide, and across the United States, where it delivers vital customer, scheduling, inventory, and financial data to empower decisions and management of the businesses.

16.     ProPoint's success depends on its SuperSalon software platform, including the salon and back office software products, which are its flagship products and the lifeblood of the company. ProPoint regularly updates and improves its platform, to better suit the needs of its customers and maintain its prominence in the marketplace.

17.     The ProPoint platform source code includes source code relating to a database, including program logic and tables, source code relating to operation of the database, and source code defining and controlling the structure of the database, called the schema.  This source code is proprietary to ProPoint, and is closely held.

18.     The schema is the blueprint of how a database is constructed. Similar to the blueprints of a house, the schema provides an outline or model that outlines and describes the structure of the database, such as what files are present and how they are organized. The schema acts as a communicator between the source code and the databases of ProPoint's customers' salons and spas.

19.     Possession of ProPoint's schema (which is part of the source code) would allow software programmers to replicate other portion(s) of ProPoint's source code and database, and – aided by improperly obtained screen captures of the user interface – replicate the entirety of ProPoint's appearance and functionality, and facilitate conversion of ProPoint's customers. Further, access to the schema would act as a treasure map to guide software programmers to specific places where critical data is located. With access to the schema and program logic, a programmer would have the ability to understand how the underlying data is related and how the source code interacts

with the data. That access would also permit the software programmer to create scripts to target certain data and download that data from databases.

20.     ProPoint has benefited from keeping its source code, including the schema and program logic, and other proprietary information secret.

21.     ProPoint's source code, which includes, *inter alia*, its schema and program logic, are confidential and proprietary to ProPoint and constitute trade secrets.

22.     ProPoint also owns data generated by the software associated with the SuperSalon point of sale system.

23.     Collectively, the source code, including the schema and program logic, and data generated from the SuperSalon point of sale system will be referred to as the "Proprietary Information."

24.     ProPoint has taken reasonable efforts to protect and maintain the secrecy of its Proprietary Information.

25.     For example, ProPoint issued credentials, including a user name and password, to entities permitted and authorized to access its point-of-sales platform, including to its customers. These credentials are associated with and issued directly to individual entities, and not authorized for use by other parties. ProPoint has confidentiality agreements as part of agreements with its customers to confirm that the customers will not disclose Proprietary Information.

26.     Pursuant to at least the Software Agreement between ProPoint and franchisees (an example being BKM Salons), "[o]nly the customer [i.e., BKM Salons] may use the Licensed Software, on a single computer in a single physical location as registered in the product registration." Under the same agreement, the Licensed Software includes at least all "copyrights, patent rights, trademark and service mark rights, trade secret rights, know-how, and other intellectual property rights." That agreement also provides ProPoint owns the user displays associated with the Licensed Software as well as the "data generated by the software, and any accompanying materials."

27.     That is, the Proprietary Information described herein is subject to the strictures of the Software Agreement.

28.     The Software Agreement permits ProPoint to "impose limits on certain features and services or restrict Customer's access to parts or all of the Licensed Software without notice or liability."

29.     The Software Agreement imposes on ProPoint's customers, including BKM Salons, the obligation to "maintain[] the security of its software and network."  This obligation provides for at least the security of the Proprietary Information.

30.     The Software Agreement also imposes express Confidentiality obligations on ProPoint's customers, including BKM Salons.  The Software Agreement provides that the "Licensed Software, add-on features, and services and all other business information is confidential and proprietary."  Under the stricture of the agreement, customers "*shall not disclose or disseminate*, or permit any employee, agent *or other party* working under Customer's direction to disclose or disseminate, the substance of any such confidential information of ProPoint."

31.     Finally, the Software Agreement establishes that monetary damages may not be a sufficient remedy for unauthorized disclosures or use of ProPoint's confidential information, and that ProPoint may seek injunctive and equitable relief without waiver of other rights.

32.     ProPoint also maintains procedures to prevent third party access to servers where the proprietary information resides, including conducting tests to ensure there are no intrusions.

*Regis' Knowledge of ProPoint's Proprietary Software*

33.     In April 2013, Defendant Regis entered into a Professional Services Master Agreement with Plaintiff (the "Professional Services Agreement"), then known as Rogers Development Inc., with an effective date of April 12, 2013.

34.     The Professional Services Agreement was intended to provide for the deployment of software services pursuant to separate Statements of Work.

35.     The Professional Services Agreement expressly provided that, "[f]or the avoidance of any doubt, [Plaintiff] shall retain unrestricted ownership rights to any pre-existing Supplier [i.e., Plaintiff] code portions or other materials or developments (including any and all enhancements made

thereto and any code, materials or developments based on or derivative thereof during the course of this work effort) included in any software furnished to Customer."

36.     The Professional Services Agreement included confidentiality obligations, applicable to Defendant Regis.

37.     In pertinent part, the Professional Services Agreement acknowledged that "each Party may furnish to the other Party certain proprietary, non-public, confidential, *trade secret*, and other information." (emphasis added).

38.     The Professional Services Agreement strictly limited any use of confidential information exchanged, such that Defendant Regis was obliged to only "use the Confidential Information of the other Party [*i.e.,* ProPoint] for the purpose of performance of their [*i.e.*, Regis'] obligations under this Agreement."

39.     Use of ProPoint's Proprietary Information to develop a point-of-sale platform in direct competition with ProPoint's own offering was not, and has never been, within the contemplated scope of Defendant Regis' obligations under the Professional Services Agreement.

40.     The Professional Services Agreement further provided that, absent written authorization, Defendant Regis shall not "reproduce, copy, duplicate, divulge, or use any Confidential Information, or allow any Confidential Information to be reproduced, copied, duplicated, divulged or used," and placed additional strictures on the storage of and access to any such information.

41.     The Professional Services Agreement further obliged Defendant Regis to require that "all persons, employees, agents, partners, consultants, contractors, representatives [], and any other third parties [] who are permitted access to any Confidential Information to agree in writing to assume all of the same obligations regarding the protection of the Confidential Information assumed by the Parties[.]"

42.      On information and belief based on evidence available to date, any portion of the Proprietary Information described herein obtained directly from ProPoint by Defendant Regis—and used, accessed, or otherwise related to the misconduct described herein—was obtained by Defendant Regis under the auspice of the Professional Services Agreement.

43.     Based on at least the provisions described above, Defendant Regis was on actual notice that ProPoint considered, treated, and took affirmative steps to protect the confidentiality of its Proprietary Information.

*Defendants' Unauthorized Attempts to Access and Access of ProPoint's Proprietary Software*

44.     In September of 2019, Defendant Regis held a conference for its salons, where it announced and promoted that it was in the process of developing a point-of-sale software platform for salons.

45.     Raj Mahajan, CEO of ProPoint, was in attendance at the conference and heard of Defendant Regis' nascent point-of-sale software platform, which he understood would be offered in competition to ProPoint's own platform based on the announcement.

46.     Before Defendant Regis' announcement and as of the filing of this Complaint, ProPoint has provided software services to Defendant Regis, which deploys ProPoint's proprietary software platform in hair salons across the country.

47.     ProPoint directed its efforts to development of new features related to its proprietary software platform based on Defendants' Regis' announcement.

48.     Defendant Regis has not yet deployed the point-of-sale software platform for salons that Regis announced at the September 5, 2019 conference.

49.     The week of March 2, 2020, ProPoint received an unsolicited phone call from, on information and belief, a former employee or contractor of Regis, herein identified as Whistleblower A.[1]  In the course of the ensuing conversation, Whistleblower A advised ProPoint that Defendant Regis had encountered issues developing its own software and resorted to stealing ProPoint's proprietary software platform.

50.     Specifically, Whistleblower A advised that Defendant Regis had failed to produce a customer-acceptable software system. In order to meet deadlines, Defendant Regis' CTO, Defendant Kapadia, instructed his team to copy the ProPoint software system.

---

[1] Additional information will be provided as relevant and appropriate in this Action, including following entry of a suitable protective order.

51.     Whistleblower A informed ProPoint that Regis had gained unauthorized, or at least exceeded legitimate, access to ProPoint's internal systems and to its confidential, proprietary source code through at least (1) the unauthorized use of the credentials of a ProPoint franchisee located in this judicial district to access ProPoint's software, and (2) by reference to a copy of ProPoint's source code held by Defendant John Doe in a Regis location in Minnesota.

52.     Whistleblower A advised that Defendant Regis downloaded data via the unauthorized access point to ProPoint's computer system that was designed solely to permit the franchisee to access data related to the salon. One file destination related to the improper access was **com.regiscorp.athena.beta.migration**.  On information and belief, this data was downloaded to a server controlled and operated by Defendant Regis.  *See* Paragraph 86.

53.     Under no circumstance was the BKM Salons permitted to provide credentials to a third party to access the data.  *And see* Paragraphs 29–30.  ProPoint contracts with its customers prohibited granting any third party access rights. *See* Paragraph 30.  Upon information and belief, including based on Regis' own prior dealings and agreements with ProPoint, Regis was aware of the confidential nature of the access and knew that it was not permitted to access the access point for the purposes described herein.

54.     Whistleblower A additionally advised that, when the team employed by Defendant Regis was unable to overcome issues in the development of its own point-of-sale platform, it would contact John Doe, in Defendant Regis's Minnesota offices, to ask how the issue was resolved in ProPoint's confidential, proprietary source code.

55.     Whistleblower A additionally informed that Defendant Regis had requested that BKM Salons (*see* Paragraph 50) make screen captures of the ProPoint user interface.  On information and belief, Defendants intend to use these screen captures, in conjunction with the functionality uniquely enabled and provided by the ProPoint source code, in order to mimic the look, feel, and/or operability of the ProPoint software platform in order to improperly compete and convert customers.

56.     Specifically, by duplicating the functionality, operability, and layout of the ProPoint software, Defendant Regis would be more easily able to convert and migrate ProPoint's existing customers, in effect offering them an easier transition to Defendant Regis' new software platform.

57.     Whistleblower A further advised that Defendant Regis had attempted to develop its own point-of-sale platform without relying on ProPoint's confidential, proprietary source code, but had been unsuccessful, and that Defendant Regis' failure had led to its concerted efforts to misappropriate and infringe upon ProPoint's source code.

58.     On information and belief based on the above, Defendant Kapadia was directly responsible for directing and ordering the efforts that culminated in Defendants' attempts to and improper access of ProPoint's confidential, proprietary source code.

59.     To wit, Whistleblower A advised that Mr. Kapadia had instructed the team employed by Regis to develop the competing point-of-sale system to coordinate all such activities on a Google Drive and/or related services[2] not connected or affiliated with Defendant Regis' internal network infrastructure.

60.     Further, Whistleblower A advised that Mr. Kapadia had instructed the team members to avoid use of Defendant Regis' internal network infrastructure (e.g., servers and email) to store, discuss, or coordinate any activities related to the reference to, or use or access of, ProPoint's Proprietary Information.

61.     On information and belief based on the above, Defendants have not been successful at developing and deploying a customer-accepted point-of-sale solution as Regis promised at the September 2019 conference.

62.     On information and belief based on the above, Defendants believed they would not be able to successfully develop and deploy a customer-accepted point-of-sale solution, as promised by Regis at the September 2019 conference, without using ProPoint's Proprietary Information.

63.     On information and belief based on the above, Defendants' used login credentials intended for and issued to a third party in order to access ProPoint's platform.

64.     On information and belief based on the above, Defendants knew that the third party's login credentials had not been issued for Defendants' use, or to otherwise permit Defendants to access ProPoint's systems.

---

[2] Including, for example, Google Docs.

65.     On information and belief based on the above, Defendants accessed ProPoint's platform in order to access and obtain copies of ProPoint's confidential information, where such information was not otherwise accessible to Defendants without use of the credentials.

66.     On information and belief based on the above, Defendants knew this access was without any authorization by ProPoint.

67.     On information and belief based on the above, Defendant Kapadia instructed members of Regis' computer programming staff to create and exclusively use a storage space outside of Regis' corporate servers.

68.     On information and belief based on the above, Defendants intentionally created a storage space off of Regis' computer system to store information obtained by accessing ProPoint's platform via a third party's login credentials.

69.     On information and belief based on the above, Defendant Kapadia did not inform Regis' in-house legal counsel regarding Defendant's intended and actual use of a third party's login credentials.

70.     On information and belief based on the above, Defendant Kapadia did not inform Regis' outside legal counsel regarding Defendant's intended and actual use of a third party's login credentials.

71.     On information and belief based on the above, Defendant Kapadia did not inform Regis' board of directors regarding Defendant's intended and actual use of a third party's login credentials.

72.     On information and belief based on the above, Defendant Kapadia did not inform Regis' board of directors regarding Defendants intended and actual use of ProPoint's Proprietary Information to develop Defendant Regis' planned point-of-sale platform.

73.     On information and belief based on the above, Defendant Kapadia did not inform Regis' board of directors regarding Defendants' failure to develop a point-of-sale platform without use of or reliance on ProPoint's Proprietary Information.

74.     On information and belief based on the above, Defendants stored copies of confidential information accessed and obtained from ProPoint's platform on the Google Drive service and/or related services.

75.     On information and belief based on the above, Defendants stored copies of confidential source code for ProPoint's system on the Google Drive and related services.

76.     On information and belief, at least Defendant Kapadia had access to and knowledge of the Google Drive instance described in Paragraphs 74 and 75.

77.     On information and belief, Defendants replicated the file structure and folder hierarchy of ProPoint's servers on the Google Drive instance described in Paragraphs 74 and 75.

78.     On information and belief based on the above, Defendants undertook the use of the Google Drive service and/or related services to host efforts to review, analyze, emulate, or duplicate ProPoint's confidential information in an effort to evade corporate oversight and document retention policies, and in an effort to hide relevant evidence from discovery in the event of any lawsuit.

79.     On information and belief, Defendants, including at least Defendant Kapadia, instructed employees and the team tasked with development Defendant Regis' point-of-sale platform to use the Google Drive and related services because Defendants expected a lawsuit, such as this one, would be filed.

*ProPoint's Efforts to Verify Whistleblower A's Account*

80.     In reaction to the nature and scope of Whistleblower A's account, ProPoint undertook immediate action to attempt to verify details regarding the potential intrusions into and unauthorized access of the ProPoint source code.  Based on the surreptitious acts by Defendants, however, certain details regarding Defendants' misconduct will only be revealed by fulsome discovery upon commencement of this action.

81.     In order to adequately address the security risks and vulnerabilities implicated by Defendants' ongoing misconduct, ProPoint expects and intends to seek discovery into such evidence, including through depositions of key personnel employed by or directing Defendant Regis, such as Defendant Kapadia (it's Chief Technology Officer); Hugh Sawyer (it's Chief Executive Officer); Jim

Lain (it's Chief Operating Officer); Virginia Gambale (Board member in charge of technology); and of John Does 1-10, and will move to amend this Complaint to join additional defendants responsible for the misconduct described herein as appropriate.

82.    As part of these efforts, ProPoint investigated and analyzed server access logs for its franchisee (*see* Paragraph 50) to determine whether records of Defendants' improper access through unauthorized use of credentials and/or by exploiting vulnerabilities in ProPoint's platform could be identified. ProPoint's efforts confirmed that Defendants, acting individually or in concert, did both.

83.    Attached as **Exhibit A**, in redacted form in the public version of this Complaint, is an export of certain server logs from ProPoint's franchisee.[3]

84.    As demonstrated in Exhibit A, on at least two occasions including November 10, 2019 and February 21, 2020, a user (John Doe 1) gained access to a computer system operating ProPoint's software. Upon information and belief based on analysis of the log file, the access was not accidental, but was intentional. As evidence, the user employed AWS Tools for Windows PowerShell to access the scripting environment. The user ran MySQL and ran queries against the database. Upon information and belief, the queries were used to determine header information.

85.    The user also deployed an executable file called a script module against ProPoint's reporting system.  The script module accesses information from the computer system based on the script and exports sensitive and confidential data.  Each such query exported data to a common path: **C:\users\Elo\Documents\AthenaData\CSVs\**.  *E.g.,* Ex. A:

```
11/10/2019 13:21:58 - Exported data to file
C:\users\Elo\Documents\AthenaData\CSVs\customer.csv
```

86.    The malware scripts deployed by at least John Doe 1 then compressed the resulting comma-separated value files and uploaded them to: **com.regiscorp.athena.beta.migration**.  That is,

---

[3] In the redacted version of Exhibit A, queries run as part of the intrusion effort have been redacted to prevent additional intrusions into and misappropriations of ProPoint's software platform.

the malware scripts exfiltrated information to a server owned and controlled by, on information and belief based on the network path, to Defendant Regis.  *E.g.*, Ex. A:

```
02/21/2020 10:27:35 - com.regiscorp.athena.beta.migration
02/21/2020 10:27:35 - AKIAQR44EFOGACDIPU7R
02/21/2020 10:27:35 - 2Q8YVHBYWe1s+JXMimotz4Fo4FuZ3A5FTKcu09a7
02/21/2020 10:27:35 - Beginning file upload process.
02/21/2020 10:27:35 - Uploading zip file.
02/21/2020 10:38:48 - File upload process complete.
02/21/2020 10:38:48 - com.regiscorp.athena.beta.migration
02/21/2020 10:38:48 - AKIAQR44EFOGACDIPU7R
02/21/2020 10:38:48 - 2Q8YVHBYWe1s+JXMimotz4Fo4FuZ3A5FTKcu09a7
02/21/2020 10:38:49 - Success: Uploaded ZIP file is equal in size to the local copy.
```

87.     On information and belief, based on the file structure utilized by the malware script and the server path for the exfiltration of ProPoint's confidential, proprietary information, "Athena" is the code name for the point-of-sale platform under development by Defendant Regis.

88.     On information and belief based on forensic analysis of at least Exhibit A, Defendants used BKM Salons' credentials in November 2019 to explore and gain information about ProPoint's system, including at least its data structure, and exfiltrate certain data.

89.     On information and belief based on the same analysis of Exhibit A, Defendants again improperly used credentials issued to BKM Salons in February 2020 to update and expand upon the data and information previously exfiltrated during the November 2019 session.

90.     On information and belief based on the same analysis of Exhibit A, Defendants downloaded the information exfiltrated during the February 2020 sessions into a table created and structured based on analysis of the ProPoint schema.

91.     On information and belief based on the above, Defendant Regis configured the server to which ProPoint's data was exfiltrated, and provided credentials for such server to one or more of Defendants, including at least Defendant John Doe 1, or to Defendants' agents, employees, contractors, or the team tasked with development Defendant Regis' point-of-sale platform.

92.     The queries deployed by John Doe 1 against ProPoint's software performed by Defendants' scripts demonstrate one or more Defendants had improperly obtained the ProPoint schema and Proprietary Information, as the queries demonstrate knowledge of the location of data within the database only informed by the schema.

93.     Defendants' use of an improperly obtained copy of ProPoint's schema is further confirmed by the rapid succession of queries, most within seconds of one another.  That is, the server logs do not reflect unsuccessful attempts to query paths using a "trial-and-error" approach to explore potential or likely file paths containing information.  Instead, each query deployed by John Doe 1 against the ProPoint server returned information.  This demonstrates that John Doe 1, and any other individual or individuals that authorized the script module, had intimate knowledge of the ProPoint schema only available from access to same.

94.     On information and belief based on the above, Defendants have a copy of source code for ProPoint's point-of-sale platform.

95.     Upon information and belief based on the above, Defendants have a copy of ProPoint's data associated with its SuperSalon software from at least the franchisee BKM Salons.

96.     On information and belief based on the above, Defendants have incorporated portions of ProPoint's source code into the source code that it is developing.

**COUNT I**
*The Defend Trade Secret Act, 18 U.S.C. § 1836 Et Seq.*

97.     ProPoint realleges and incorporates herein by reference the allegations contained in all previous paragraphs herein.

98.     This cause of action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.* ("DTSA").

99.     As described in Paragraph 6, Defendants' misappropriation of ProPoint's Proprietary Information, including at least the schema, relates to a product or services used, or intended for use, in interstate or foreign commerce.

100.    Under the DTSA, a trade secret is any "form and type[] of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C. 1839(3).

101.    ProPoint's Proprietary Information, including at least the schema, is a trade secret within the meaning of the DTSA.  *Id.*

102.    As described in detail herein (*e.g.*, Paragraphs 24 through 31), ProPoint took reasonable steps and affirmative measures to keep the Proprietary Information secret, including issuance of specific credentials to authorized users (Paragraph 25); requiring that authorized copies of the software run only on a single computer in a single registered physical location (Paragraph 26); preserving the right to impose limitations on access to the software without notice (Paragraph 28); imposing affirmative obligations on licensees to ensure the security of its software and network (Paragraph 29); and imposing rigorous confidentiality requirements expressly prohibiting the dissemination or disclosure of any confidential information, including at least the Proprietary Information (Paragraph 30).

103.    ProPoint's Proprietary Information derives independent economic value from maintaining the secrecy of its Proprietary Information, which is not ascertainable through proper means, including at least:

   a.   ProPoint's Proprietary Information is necessary for the operation of its software, in order to provide efficient and functional provision of its services to its customers;

   b.   The Proprietary Information provides customers with unique and powerful access to data in the ProPoint database and software;

   c.   Keeping the Proprietary Information secret has allowed ProPoint to effectively compete in the point-of-sales software industry.  For example, Defendants' actions and conduct illustrate that (1) Defendant Regis believed it could not compete in the market place without mirroring the functionality and capabilities provided by the Proprietary Information, and (2) that it was unable to develop a platform providing the same level of functionality and capabilities *without* misappropriating ProPoint's Proprietary Information.  *E.g.,* Paragraph 57.

d.  Keeping the Proprietary Information secret has enabled ProPoint to differentiate itself from competitors in the market place, and to provide a superior product to other point-of-sale platforms.  In turn, this differentiation and superior offering has prevented the erosion of prices for ProPoint's offering that might have been caused by competitive offerings with similar capabilities and functionality; and

e.  Keeping the Proprietary Information secret has prevented the replication of ProPoint's platform by competitors, in whole and in part, and ensured that competitors could not modify their products to better compete with ProPoint.

104.   On information and belief based on Defendants' surreptitious conduct, Defendants knew – and should have known – that the Proprietary Information was confidential and a trade secret, including at least because (1) they took affirmative measures to obtain access to a third-party's credentials to access ProPoint functionality not otherwise available to them; (2) they used these credentials to exploit a vulnerability in the ProPoint reporting software to access information not otherwise presented or available to authorized users; (3) Defendants took affirmative steps to hide their misconduct from corporate oversight, including by having its development team work offsite, using resources siloed from Defendant Regis' network and retention infrastructure.  *E.g.,* Paragraphs 50 to 58.  Notwithstanding, Defendants sought to and acquired ProPoint's Proprietary Information through improper methods, including through the unauthorized use of the franchisee's credentials to access ProPoint's trade secret and other confidential information.

105.   Defendants misappropriated ProPoint's trade secrets as defined under the DTSA when Defendants and Defendant Regis' employees accessed and downloaded ProPoint's Proprietary Information, including at least the schema, from ProPoint's computer system to computer terminals or servers operated by Defendants. 18 U.S.C. §§ 1836(b) and 1839(5)-(6).

106.   First, based on the allegations of Paragraph 104 above, Defendants knew and should have known that its access and acquisition of the Proprietary Information through the use of credentials held by ProPoint's franchisee was by improper means.  18 U.S.C. § 1839(5)(A).

107.    Second, Defendants use of the credentials held by ProPoint's franchisee to gain improper access to ProPoint's system and to subsequently access and use the Proprietary Information was without the consent (express or implied) of ProPoint was by improper means.  18 U.S.C. § 1839(5)(B)(i).

108.    Third, at the time of Defendants' use of improper means (*e.g.,* use of the franchisee's credentials) to access and use the Proprietary Information, Defendants individually and collectively knew and had reason to know that any such knowledge was acquired under circumstances that gave rise to a duty to maintain the secrecy of the Proprietary Information, including because such information was (1) protected through use of credentials, and (2) not normally accessible even with such credentials without exploitation of vulnerabilities in ProPoint's reporting system. 18 U.S.C. § 1839(5)(B)(ii); *and see* Paragraph 93 (structure and speed of queries evinces access to schema).

109.    Fourth, Defendant's access and use of the Proprietary Information was through a person (*i.e.*, at least the franchisee) that owed a duty of confidentiality to ProPoint to maintain the secrecy of the trade secret and limit use of the trade secret, by virtue of at least the Software Agreement with BKM Salons. 18 U.S.C. § 1839(5)(B)(iii); Paragraph 30; *and see* Paragraphs 33 through 43 (alleging Defendants' knowledge of confidentiality strictures).

110.    Defendants' continued and future use or disclosure of ProPoint's Proprietary Information, including at least through any future release or offering of its announced point-of-sale platform, constitutes an additional, threatened misappropriation of ProPoint's trade secrets.

111.    As set forth herein and in Paragraphs 106 through 109, Defendants' improper means included at least theft, breach, and inducement of a breach of duty, and did not include reverse engineering, independent derivation, or any other lawful means of acquisition.  18 U.S.C. § 1839(6); *and see* Paragraph 57.

112.    Here, Defendants stole and without authorization appropriated ProPoint's Proprietary Information, including at least the schema.

113.    On information and belief based on the above, Defendants' access and use of ProPoint's Proprietary information included at least one or more of the copying, duplication, download or transmittal (*e.g.*, Paragraph 82 to 94), alteration (*e.g.,* through the creation of derivative

works based on such Proprietary Information), sending, mailing, communication and/or conveyance of the Proprietary Information.  For example, on information and belief, Defendants engaged in at least the access, modification, communication, and conveyance of the Proprietary Information stored on the Google Drive or related services.

114.    Further, based on the above, Defendant received and thereafter possessed the Proprietary Information (*e.g.,* Paragraphs 21, 50, 55, 58, and 80-94), while knowing the same to have been stolen and misappropriated, obtained, and converted without authorization (*e.g.,* Paragraphs 64, 66, and 104).

115.    Based on information and belief, based on Defendants' efforts to obtain credentials from ProPoint's franchisee, Defendants attempted to access the ProPoint platform and Proprietary Information on other occasions before obtaining credentials.

116.    Defendants acted individually and in concert with one another to perpetuate the misappropriation of ProPoint's Proprietary Information, and one or more Defendants undertook actions in furtherance of and to effect the misappropriation (*e.g.*, Paragraphs 50, 55 through 77, 80, and 93).

117.    ProPoint has suffered and will suffer damages as a direct and proximate result of Defendants' misappropriation of the Proprietary Information, including at least the schema.  These damages includes, but is not limited to, the loss of sole control over the schema and the disclosure to and use of the Proprietary Information to its competitor Regis, who intends and has taken affirmative steps to use the trade secrets to its advantage, *e.g.,* in connection with the development of and sale of Regis' point-of-sale platform.

118.    Further, Defendant Regis has been unjustly enriched by its misappropriation of the Proprietary Information, including as demonstrated by its use of the Proprietary Information in the development of its own point-of-sale platform when it could not otherwise develop a viable offering.

119.    Should additional Proprietary Information be misappropriated, ProPoint will suffer additional and similar harms.

120.    Defendants' access to and ongoing and threatened misappropriation of ProPoint's Proprietary Information is ongoing.  Defendants' improper access to the Proprietary Information and

use of ProPoint's trade secret schema caused and continues to cause irreparable harm to ProPoint, for which ProPoint has no adequate remedy at law. For example, any pending release of the Regis' point-of-sale platform, which on information and belief based on Defendants' use of the Proprietary Information would share characteristics and functionality, if not identity, with the ProPoint platform, would result in a loss in market share for ProPoint.

121.    The loss of such market share would not have an adequate remedy at law, including where customers electing to switch to a misappropriated offering from Regis declined to undertake the expense and difficulty of switching back to the ProPoint platform.  This heightened resistance to switching platforms a second time is exacerbated by the present health crisis, with customers concerned regarding the economic impact of COVID-19 being less likely to incur the cost and time required to migrate platforms twice.

122.    An injunction prohibiting Defendant Regis—including at least its employees, contractors, and the team under its control tasked with development its point-of-sale platform—as well as Defendants Kapadia and Does 1-10, from accessing and/or using ProPoint's Proprietary Information is necessary to provide ProPoint complete relief.

123.    In particular, the injunctive relief should:

a.    Enjoin Defendants from accessing ProPoint's servers, or any replicated ProPoint database or copies of ProPoint's Proprietary Information;

b.    Remove all instances of ProPoint's Proprietary Information from computers, smart devices, servers, web services, hard drives, or other storage devices (collectively "computing systems") in the possession, custody, or control of Defendants after forensic copies of any such computing systems are made;[4]

c.    Permit a computer forensic analysis of ProPoint's choosing to verify that all Proprietary Information has been removed from Defendants' computing systems, and that no copies were made; and

---

[4] For the avoidance of doubt, "web services" includes at least Google Drive and Google Docs.

1

2

3

      d.   Restrain Defendants from using any of ProPoint's Proprietary Information, or information derived from or developed based upon reference or use of the Proprietary Information, including the schema and downloaded information.

4

5

6

7

8

9

10

124.    In an effort to avoid imposing upon and taxing the limited resources of the Court during this period of temporary courthouse closures and emergency operations in response to the COVID-19 outbreak, ProPoint sought to obtain assurances from Defendants to narrow the dispute between the parties and, that failing, to obviate the need to seek a temporary restraining order and preliminary injunction.  These efforts included at least a letter sent March 25, 2020 detailing the allegations of this Complaint, and telephone conferences between counsel for ProPoint and counsel for Defendants on March 29 and 30, 2020.

11

12

13

14

15

16

125.    During the telephone conferences of March 29 and 30, 2020, the parties discussed ProPoint's intent to seek a temporary restraining order and preliminary injunction, and ProPoint informally requested assurances regarding at least document preservation, that Defendants cease efforts to access data through franchisees, that Defendants stop accessing ProPoint's Proprietary Information, and that Regis not release the Athena point-of-sale platform pending resolution of these concerns.

17

18

19

20

21

22

23

126.    Based on representations by counsel for Defendants in conference on March 30, 2020, that (1) Defendants understood their legal obligations regarding the preservation of documents, (2) that the Athena point-of-sale platform subject to ProPoint's allegations herein would not be released to the public in the immediate term, and (3) based upon ProPoint's detailed notice to Defendants of the nature of the misappropriation and intent to seek injunctive relief if needed to mitigate further harm, ProPoint continues to monitor the need to seek assistance from this Court and will move for relief when appropriate.

24

25

26

127.    ProPoint has been damaged by Defendants' access to ProPoint's Proprietary Information, and by its downloading and use of the ProPoint schema through improper means. ProPoint is entitled to monetary damages to be proven at trial.  *See* 18 U.S.C. § 1836(b)(3)(B).

27

28

128.    Defendants' misappropriation of ProPoint's Proprietary Information, including at least the schema, was willful and malicious, and entitle ProPoint to the recovery of exemplary damages

pursuant to 18 U.S.C. § 1836(b)(3)(C), and to reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

### COUNT II
*Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01 et seq.*

129.    ProPoint realleges and incorporates herein by reference the allegations contained in all previous paragraphs herein.

130.    ProPoint's Proprietary Information, including at least the schema, constitutes a trade secret within the meaning of Minn. Stat. § 325C.01.

131.    Defendants acquired ProPoint's proprietary information, including at least the schema (*see, e.g.,* Paragraph 92) through improper means within the meaning of Minn. Stat. § 325C.01, subd. 2, including at least because on current information and belief Defendants misconduct comprised one or more of theft, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

132.    Defendants acquired ProPoint's Proprietary Information, including at least the schema, through improper means within the meaning of Minn. Stat. § 325C.01, subd. 3.

133.    Defendants' continued and future use or disclosure of ProPoint's Proprietary Information, including at least through any future release or offering of its announced point-of-sale platform, constitutes an additional, threatened misappropriation of ProPoint's trade secrets under the Minnesota Uniform Trade Secrets Act.

134.    Defendants' access to and ongoing and threatened misappropriation of ProPoint's Proprietary Information is ongoing.  Defendants' improper access to the Proprietary Information and use of ProPoint's trade secret schema caused and continues to cause irreparable harm to ProPoint, for which ProPoint has no adequate remedy at law. For example, any pending release of the Regis' point-of-sale platform, which on information and belief based on Defendants' use of the Proprietary Information would share characteristics and functionality, if not identity, with the ProPoint platform, would result in a loss in market share for ProPoint.  The loss of such market share would not be have an adequate remedy at law, including where customers electing to switch to a misappropriated

offering from Regis declined to undertake the expense and difficulty of switching back to the ProPoint platform.

135.    Should additional Proprietary Information be misappropriated, ProPoint will suffer additional and similar harms.

136.    Defendants caused harm to ProPoint in Minnesota as a result of its misappropriation. Further, at least some of the misconduct alleged in this Complaint occurred in Minnesota, including on information and belief the storage and analysis of source code authored by ProPoint and improperly obtained and used by Defendants.  *See* Paragraph 50.

137.    Defendants' misconduct entitles ProPoint to an injunction pursuant to Minn. Stat. § 325C.02 to prohibit Defendant Regis—including at least its employees, contractors, and the team under its control tasked with development its point-of-sale platform—as well as Defendants Kapadia and Does 1-10, from accessing and/or using ProPoint's Proprietary Information is necessary to provide ProPoint complete relief.

138.    In particular, the injunctive relief should:

  a. Enjoin Defendants from accessing ProPoint's servers, or any replicated ProPoint database or copies of ProPoint's Proprietary Information;

  b. Remove all instances of ProPoint's Proprietary Information from computers, smart devices, servers, web services, hard drives, or other storage devices (collectively "computing systems") in the possession, custody, or control of Defendants after forensic copies of any such computing systems are made;[5]

  c. Permit a computer forensic analysis of ProPoint's choosing to verify that all Proprietary Information has been removed from Defendants' computing systems, and that no copies were made; and

  d. Restrain Defendants from using any of ProPoint's Proprietary Information, or information derived from or developed based upon reference or use of the Proprietary Information, including the schema and downloaded information (Ex. A).  *And see* Paragraphs 124-126.

---

[5] For the avoidance of doubt, "web services" includes at least Google Drive and Google Docs.

139.    ProPoint has been damaged by Defendants' access to ProPoint's Proprietary Information, and by its downloading and use of the ProPoint schema through improper means.  Based on Defendants' ongoing violation of Minn. Stat. § 325C.01 *et seq.*, ProPoint has been damaged and is entitled to monetary damages to be proven at trial.  *See* Minn. Stat. § 325C.03(a).

140.    Because Defendants' conduct was and is willful and malicious, ProPoint is entitled to exemplary damages under Minn. Stat. § 325C.03(b) and reasonable attorneys' fees under Minn. Stat. § 325C.04.

## COUNT III
*Computer Fraud and Abuse Act, 18 U.S.C. § 1030*

141.    ProPoint realleges and incorporates herein by reference the allegations contained in all previous paragraphs herein.

142.    ProPoint's point-of-sale system is hosted on servers and deployed on computers across the country, which are connected by and communicate over the internet and are used in interstate commerce and communication, and are therefore protected computers under the meaning of 18 U.S.C. § 1030(e)(2).

143.    As detailed herein, Defendants intentionally accessed ProPoint's protected computer systems without ProPoint's authorization, and additionally exceeded any authorization it had to do so.  As a result of Defendants' misconduct, they obtained information from ProPoint's protected computer system in violation of at least 18 U.S.C. § 1030(a)(2) and 1030(g).

144.    Further, Defendants knowingly and with an intent to defraud accessed ProPoint's protected computer systems without authorization by ProPoint, or exceeded any authorization it had to do so, and obtained information of value comprising at least ProPoint's Proprietary Information including the schema.  Defendants' actions thereby constitute an additional violation of at least 18 U.S.C. §§ 1030(a)(4) and 1030(g).

145.    Defendant accessed ProPoint's protected computers without permission or authorization by ProPoint in order to obtain ProPoint's confidential information.  As set forth above, Defendants knew that they were prohibited from accessing ProPoint's servers, as evinced by

Defendants' affirmative steps taken to obtain credentials from a third-party and to exploit the ill-gotten access to ProPoint's reporting software.

146.    Any authorization that Defendants did have to access the ProPoint servers, database, or systems was exceeded.  For example, Defendants' surreptitiously accessed the ProPoint database and systems by using a franchisee's credentials, and used that third-party's account as a backdoor to gain access to ProPoint's platform not otherwise available to them.

147.    Defendants, through the improper access of ProPoint's computer system, obtained an item of value.  Defendants' obtained access to ProPoint's proprietary and confidential information, including its Proprietary Information.

148.    Defendants' actions were intentional and without ProPoint's knowledge, permission, or authorization.

149.    As the direct result of Defendants' unauthorized and impermissible access, or alternatively its access exceeding authorization, ProPoint has lost more than $5,000 during the prior one-year period.  For example, ProPoint has spent numerous hours investigating, analyzing, and documenting ProPoint's access to corroborate Whistleblower A's information, investigate and determine the nature and extend of Defendants' intrusion and exfiltration efforts, and prepare and implement remedies to prevent the same breaches from occurring again.  Pursuant to 18 U.S.C. § 1030(c)(4)(A)(i)(I), ProPoint's executives, IT team, and in-house counsel have expended in excess of $5,000 to respond to Defendants' violation of 18 U.S.C. § 1030.  This time should have been, but could not be, spent conducting ProPoint's day-to-day operations.  Additionally, ProPoint incurred extensive fees from the engagement of a computer forensic expert. Further, Defendants' actions have caused missed contractual opportunities related to ProPoint's business. These costs amount to more than $5,000.

150.    ProPoint has been and will continue to be irreparably injured, while Defendants will be unjustly enriched, until all of the Proprietary Information obtained via their improper access is returned to the custody and care of ProPoint and no longer resides on Defendants' computer systems or computers operated, controlled, or otherwise accessible by Defendants.

151.   ProPoint is entitled to injunctive relief for Defendants' violation pursuant to 18 U.S.C. § 1030(g). *And see, e.g.,* Paragraph 123.

**COUNT IV**
*Intentional Interference with Contractual Relations Under Minnesota Law*

152.   ProPoint realleges and incorporates herein by reference the allegations contained in all previous paragraphs herein.

153.   On September 12, 2019, ProPoint entered into a Software Agreement with BKM Salons.

154.   The Software Agreement expressly imposed confidentiality obligations on BKM Salons.  Pursuant to the Agreement, BKM Salons was obliged to not "disclose or disseminate, or permit any employee, agent or other party working under Customer's direction to disclose or disseminate, the substance of any confidential information of ProPoint."

155.   On information and belief, Defendants had knowledge of that contract or otherwise should have known of the confidentiality obligations thereunder, including at least because of the inclusion of provisions imposing substantively similar confidentiality obligations in agreements between Plaintiff and Defendant Regis.

156.   For example, on July 5, 2007, Regis Corporation entered into a Services Agreement with Plaintiff, then known as Rogers Software Development, Inc., which contained a confidentiality provision at Section X, which in pertinent part limited the parties from any use, sale, transfer, publication, or disclosure except as needed to perform its obligations under the Agreement or as expressly authorized.

157.   For further example, on April 12, 2013, Defendant Regis entered into a Professional Services Master Agreement that contained a confidentiality provision at Section 4, which in part limited the parties' use of any confidential information to the purpose of the performance of their obligations under the Agreement.

158.   Notwithstanding actual or constructive knowledge of the existence of the confidentiality obligations imposed on BKM Salons by the Software Agreement, the Regis Defendants intentionally caused BKM Salons to breach its Software Agreement with ProPoint, an in

particular the confidentiality obligations imposed of the agreement, by, at least, using BKM Salons's credentials in order to access ProPoint's point-of-sale platform in excess of any authorization permitted under either the Regis Defendants' or BKM Salons's authorization.

159.    Additionally, the Regis Defendants intentionally caused BKM Salons to breach its Software Agreement with ProPoint by inducing BKM Salons to share its credentials with the Regis Defendants, thereby compromising the security of Franchisee's software and network as required by the Software Agreement.

160.    The Regis Defendants' conduct and actions were not justified, and resulted in obtaining unauthorized access to systems that Defendants knew to be improper.

161.    ProPoint has been and continues to be harmed by Defendants' intentional interference with its contractual relationship with BKM Salons, including at least because its Proprietary Information has been and continues to be accessed and used by its competitor Defendant Regis.

162.    As a result of the Defendants' misconduct and intentional acts, ProPoint is entitled to damages in an amount to be determined at trial.

## **DEMAND FOR JURY TRIAL**

163.    ProPoint hereby demands a trial by jury of all issues so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, ProPoint respectfully requests judgment against Defendants and in favor of ProPoint on all causes of action, and as described as follows:

A.    Entering an order against Defendants and its partners, agents, servants, employees, contractors, and attorneys, and those persons in active concert or participation with Defendants, and including at least the team tasked with development of Defendant Regis' point-of-sale platform:

a.    Prohibiting any access by Defendants of ProPoint's servers, or any replicated ProPoint database or copies of ProPoint's Proprietary Information;

b.    Restraining Defendants from deleting, modifying, or accessing any instance of ProPoint's Proprietary Information, including its schema and any ProPoint source

code, on Defendants' computers, smart devices, servers, web services, hard drives, or other storage devices;

  c. Restraining Defendants from the use of ProPoint's Proprietary Information, including its schema and source code and any source code, references, notes, or other documents created based on, following reference to or review of, or otherwise utilizing any knowledge derived from ProPoint's confidential information; and

  d. Restraining Defendants from further development of Defendant Regis' point-of-sale platform, pending forensic review and analysis of same.

B. Entering a preliminary and permanent injunction against Defendants and its partners, agents, servants, employees, contractors, and attorneys, and those persons in active concert or participation with Defendants, and including at least the team tasked with development of Defendant Regis' point-of-sale platform, to require Defendants to:

  a. Remove all instances of ProPoint's Proprietary Information from any and all computer systems in the possession, custody, or control of Defendants after forensic copies of any such computing systems are made, including from any Google web services such as Google Drive or Google Docs;

  b. Permit a computer forensic analysis of ProPoint's choosing to verify that all Proprietary Information has been removed from Defendants' computing systems, and that no copies were made; and

  c. Restrain Defendants from using any of ProPoint's Proprietary Information, or information derived from or developed based upon reference or use of the Proprietary Information, including the schema and downloaded information (Ex. A).

C. A finding that Defendants have misappropriated ProPoint's trade secrets under the DTSA and Minnesota state law;

D. A finding that Defendants have violated the Computer Fraud and Abuse Act;

E.      A finding that Defendants have tortiously interfered with contractual relations between ProPoint and its franchisee(s);

F.      Awarding damages as allowed under 18 U.S.C. § 1836(b)(3)(B), Minn. Stat. § 325C.03(a), and Minnesota law for intentional interference with contractual relations, including actual damages, disgorgement of profits, unjust enrichment damages, and/or a reasonable royalty;

G.      A finding that Defendants' actions have been willful and malicious, and that pursuant to 18 U.S.C. § 1836(b)(3)(C) and Minn. Stat. § 325C.03(b) ProPoint is entitled to exemplary damages in twice the amount of damages awarded and reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and Minn. Stat. § 325C.04;

H.      That ProPoint be granted pre-judgment and post-judgment interest on the damages caused to it by reason of Defendants' misconduct;

I.       That Defendants file with this Court and serve upon ProPoint within thirty (30) days after service upon Defendants of an injunction in this action, a written report by Defendants, under oath, setting forth in detail the manner in which Defendants have complied with the injunction; and

J.       That ProPoint be granted such other relief as the Court may deem just and proper under the circumstances.

DATED:  March 31 , 2020            By:  */s/ James W. Beard*
                                                                MERCHANT & GOULD P.C.
                                                                Heather Kliebenstein (*pro hac* forthcoming)
                                                                William Schultz (*pro hac* forthcoming)
                                                                150 South Fifth Street, Suite 2200
                                                                Minneapolis, Minnesota 55402
                                                                hkliebenstein@merchantgould.com
                                                                wshultz@merchantgould.com
                                                                Telephone:  612.332.5300
                                                                Facsimile:   612.332.9081

                                                                James Beard (SBN 267242)
                                                                Denver, Colorado 80238
                                                                1801 California Street, Suite 3300
                                                                Denver, Colorado 80238
                                                                jbeard@merchantgould.com
                                                                Telephone:  303.357.1670
                                                                Facsimile:   612.332.9081

                                                                *Attorneys for ProPoint Solutions, LLC*